IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| KEVIN PRIEST, *et al.*, on behalf of themselves and all others similarly situated, <br>     Plaintiffs, <br><br>          v. <br><br> DBI SERVICES, LLC., <br>     Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 3:21cv712 (RCY) <br> ) <br> ) <br> ) <br> ) |

**MEMORANDUM OPINION**

This matter comes before the Court on Plaintiffs' Renewed Motion for Default Judgment (ECF No. 17), seeking entry of default judgment against Defendant DBI Services, LLC ("Defendant" or "DBI"). Defendant did not file a response to Plaintiff's motion, and the deadline to respond has passed. The Court previously issued an Order (ECF No. 16) adopting the Report and Recommendation of the Magistrate Judge and denying without prejudice Plaintiffs' prior Motion for Default Judgment (ECF No. 12). For the reasons stated herein, the Court will deny Plaintiffs' Renewed Motion for Default Judgment without prejudice (ECF No. 17).

**I. BACKGROUND**

**A. Procedural History**

On November 11, 2021, Plaintiffs filed a Class Action Complaint (ECF No. 1) against Defendant, followed by the First Amended Class Action Complaint (ECF No. 4) on February 23, 2022. Despite proper service, Defendant failed to appear to contest the allegations in the Complaint or otherwise defend this action (ECF No. 5). On April 22, 2022, the Clerk of the Court entered default against the Defendant (ECF No. 11).

1

Following the entry of default, Plaintiffs filed a Motion for Default Judgment (ECF No. 12) on May 9, 2022. On June 9, 2022, Plaintiffs' Motion for Default Judgment was referred to United States Magistrate Judge Elizabeth W. Hanes[1] for a Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 13.) On July 21, 2022, Judge Hanes recommended that the Court deny the Motion for Default Judgment without prejudice, holding that Plaintiffs failed to sufficiently allege whether Defendant's "Virginia-based yards" constituted a "single site of employment" such that Defendant ordered a "plant closing or mass layoff" as defined by the Worder Adjustment and Retraining Notification ("WARN") Act. (ECF No. 14.) On September 14, 2022, the Court adopted the Report and Recommendation, ordering that Plaintiffs' Motion for Default Judgment be denied without prejudice. (ECF No. 16.) On October 18, 2022, Plaintiffs filed a Renewed Motion for Default Judgment (ECF No. 17). The matter is ripe for review.

**B. Factual Allegations**

Plaintiffs Kevin Priest, Antone Harris, and Marcus Wallace were all employed by Defendant DBI Services, LLC to perform "highway and rest stop maintenance, landscaping, and similar duties within the Commonwealth of Virginia." (*E.g.*, Sworn Decl. Damages Pl. Kevin Priest ¶ 4, ECF No. 18-1.) On October 22, 2021, Defendant, without any notice, announced the closure of its Virginia-based yards, terminated their employment, and terminated the employment of more than one hundred of its Virginia-based employees that performed the same highway and rest stop maintenance, landscaping, and other duties that the Plaintiffs performed. (*E.g.*, *id.* ¶ 6.)

Mr. Gerald Williams, the supervisor of "'Richmond North[,]' a Virginia-based yard owned and operated by [Defendant]," worked for the Defendant for three years, during which time he

---

[1] Magistrate Judge Elizabeth W. Hanes was elevated to the position of United States District Judge on August 5, 2022.

2

"cultivated personal knowledge of the organizational structure of the business and its relationship with the Virginia Department of Transportation ("VDOT")." (Decl. Gerald Williams ¶¶ 3–5, ECF No. 18-4.) As the supervisor of the named Plaintiffs throughout the period of their employment with Defendant, Mr. Williams organized the team of employees to conduct the work that a VDOT agent dictated to him, including performing highway and rest stop maintenance, landscaping, and other similar duties. (*Id.* ¶¶ 2, 6–7.) Mr. Williams states that the purpose of all the "Virginia-based yards was to do the work delegated to [the Defendant] pursuant to its contracts with VDOT," and that all of the "Virginia-based yards did, more or less, the same work for VDOT pursuant to the specific yard's contract." (*Id.* ¶¶ 8–10.) Additionally, Mr. Williams states that:

12. All Virginia-based yards had an agent of VDOT monitroing and directing the day-to-day work of the Virginia-based yards.
13. For Virginia-based yards which were grouped under the same contract, employees could start their day at one yard and end at another.
14. Further, for those yards which were under the same contract, equipment and staff were regularly exchanged to meet the goals set by the specific conduct.
15. In my tenure with DBI, I have observed VDOT coordinated Virginia-based yards which were under separate contracts to do work on a single incident or project.
16. When VDOT coordinated various Virginia-based yards under different contracts to perform joint work, the Virginia-based yards would share equipment and staff to accomplish the shared operational purpose.
17. In my tenure with DBI, I have observed the Virginia-based yards grouped together under some contracts and then broken up and regrouped under a different contract.
18. Specifically, one year prior to DBI's winding down of business operations, a group of four Virginia-based yards in Richmond which had been connected by contract were disconnected and reconnected in a pair of two Virginia-based yards operating under different contracts.

(*Id.* ¶¶ 12–18.)

## II. LEGAL STANDARD

Rule 55 of the Federal Rules of Civil Procedure outlines the process for entries of default and default judgment. Under Rule 55(a), "the clerk must enter the party's default" when "a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend." Fed. R. Civ. P. 55(a). After the clerk has entered default, the plaintiff may request the entry of a default judgment. *See* Fed. R. Civ. P. 55(b). If the claim is for a "sum certain or a sum that can be made certain by computation, the clerk . . . must enter judgment for that amount." Fed. R. Civ. P. 55(b)(1). If the claim is not for a sum certain, the plaintiff must apply to the court for entry of a default judgment. Fed. R. Civ. P. 55(b)(2). When considering whether to enter default, a court must exercise sound discretion. *EMI April Music, Inc. v. White*, 618 F. Supp. 2d 497, 505 (E.D. Va. 2009). "The moving party is not entitled to default judgment as a matter of right." *Id*. "Upon default, facts alleged in the complaint are deemed admitted and the appropriate inquiry is whether the facts as alleged state a claim." *GlobalSantaFe Corp. v. Globalsantafe.com*, 250 F. Supp. 2d 610, 612 n.3 (E.D. Va. 2003); *see Anderson v. Found. for Advancement, Educ. & Emp't of Am. Indians*, 155 F.3d 500, 506 (4th Cir. 1998). However, a plaintiff's factual allegations are not automatically accepted as true for the purposes of damages. *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001); *Kindred v. McLeod*, No. 3:08cv19, 2010 WL 4814360, at *3 (W.D. Va. Nov. 19, 2010).

## III. DISCUSSION

### A. The WARN Act

"The WARN Act was enacted in 1988 to provide notice of sudden, significant employment loss so that workers could seek alternative employment and their communities could prepare for the economic disruption of a mass layoff." *Meson v. GATX Tech. Servs. Corp.*, 507 F.3d 803, 808

4

(4th Cir. 2007). The WARN Act requires "employers" to provide affected employees and appropriate government authorities with 60 days' notice before ordering a "plant closing or mass layoff." 29 U.S.C. § 2102(a). "An employer who fails to provide this notice is liable to each affected employee for backpay, benefits, and attorney's fees." *Meson*, 507 F.3d at 808; *see* 29 U.S.C. § 2104(a). The Act defines "employer" as "any business enterprise that employs . . . 100 or more employees." 29 U.S.C. § 2101(a)(1)(A). The Act defines a "plant closing" as a shutdown of a "single site of employment" that results in the employment loss of "50 or more employees" within a 30-day period at that "single site of employment." 29 U.S.C. § 2101(a)(2). Similarly, the Act defines a "mass layoff" as a reduction in workforce over a 30-day period at a "single site of employment," that affects (i) at least 33 percent of the employees and a minimum of 50 employees or (ii) at least 500 employees. 29 U.S.C. § 2101(a)(3)(B). Plaintiffs seeking to vindicate their rights under the WARN Act may do so individually and for "other persons similarly situated" in the United States District Court where the violation occurred or where the employer does business. 29 U.S.C. § 2104(a)(5).

The WARN Act itself does not define what a "single site of employment" is, but courts have held that "[a]s a general rule, geographically related facilities are single sites of employment whereas geographically separate facilities are separate sites." *Rifkin v. McDonnell Douglas Corp.*, 78 F.3d 1277, 1280 (8th Cir. 1996); *see also Davis v. Signal Int'l Texas GP, L.L.C.*, 728 F.3d 482, 487 (5th Cir. 2013). Furthermore, Department of Labor regulations[2] give examples of what constitutes a "single site of employment," depending on the type of work, employer, employee, and workplace at issue. *See* 20 C.F.R. § 639.3(i). These regulations provide in relevant part:

---

[2] The Fourth Circuit has noted that the Department of Labor "regulations are entitled to 'controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.'" *Meson*, 507 F.3d at 808 (quoting *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984)).

(3) Separate buildings or areas which are not directly connected or in immediate proximity may be considered a *single site of employment* if they are in reasonable geographic proximity, used for the same purpose, and share the same staff and equipment. An example is an employer who manages a number of warehouses in an area but who regularly shifts or rotates the same employees from one building to another.

(4) Non-contiguous sites in the same geographic area which do not share the same staff or operational purpose should not be considered *a single site*. For example, assembly plants which are located on opposite sides of a town and which are managed by a single employer are separate sites if they employ different workers.

. . .

(6) For workers whose primary duties require travel from point to point, who are outstationed, or whose primary duties involve work outside any of the employer's regular employment sites (e.g., railroad workers, bus drivers, salespersons), the *single site of employment* to which they are assigned as their home base, from which their work is assigned, or to which they report will be the *single site* in which they are covered for WARN purposes.

. . .

(8) The term "single site of employment" may also apply to truly unusual organizational situations where the above criteria do not reasonably apply. The application of this definition with the intent to evade the purpose of the Act to provide notice is not acceptable.

*Id.* (emphases added).

**B. Plaintiffs' First Motion for Default Judgment**

In the first Motion for Default Judgment, Plaintiffs claimed that Defendant "terminated the employment of Plaintiffs and more than one hundred (100) of [Defendant's] Virginia-based employees performing highway and rest stop maintenance, landscaping, and similar duties as directed by [Defendant]" and violated the WARN Act by not "providing at least sixty (60) days' written notice to each employee who will be terminated." (Mot. Default J. 2–3, ECF No. 12.) As such, Plaintiffs sought damages from the Defendant in the form of wages and employment benefits for the sixty days from the Plaintiffs' October 22, 2021 termination, attorney's fees, and litigation expenses. (*Id.* 4–5.)

6

After review of Plaintiffs' Motion for Default Judgment, Judge Hanes prepared a Report and Recommendation. The Report and Recommendation recommended that Plaintiffs' Motion for Default Judgment be denied without prejudice.[3] (R. & R. 11, ECF No. 14.)[4] In the Report and Recommendation, Judge Hanes found that Plaintiffs established sufficient facts to show that the Court had proper jurisdiction over the suit, that Defendant was an "employer" in terms of the WARN Act, and that Defendant failed to give Plaintiffs the required 60 days' notice of termination. (*Id.* 5–7.) However, Judge Hanes found that "Plaintiffs have failed to allege sufficient facts establishing that Defendant ordered a 'plant closing or mass layoff,'" because "Plaintiffs have not alleged sufficient facts for the Court to conclude that all of Defendant's 'Virginia-based yards,' collectively, constitute a 'single site of employment.'" (*Id.* 7, 9.) Thus, in denying Plaintiffs' Motion for Default Judgment without prejudice, the Court permitted Plaintiffs to re-file to prove—if possible—the only remaining legal question: whether Defendant ordered a "plant closing or mass layoff" as defined by the WARN Act. (*See* Order, ECF No. 16).

**C. Plaintiffs' Renewed Motion for Default Judgment**

In their Renewed Motion for Default Judgment, Plaintiffs argue that they have now sufficiently alleged that Defendant ordered a "plant closing or mass layoff." (Mem. Supp. Renewed Mot. 7, ECF No. 18.) In support of that contention, Plaintiffs allege that (1) Defendant terminated more than 100 of its employees on the same day; and (2) that Defendant's Virginia-based yards, collectively, constituted a "single site of employment." (*Id.*) Plaintiffs have included the sworn affidavits of Plaintiffs Kevin Priest, Antone Harris, and Marcus Wallace, all of which

---

[3] As stated above, on September 14, 2022, the Court adopted and approved the findings and recommendations set forth in the Report and Recommendation. (ECF No. 14.)

[4] The Report and Recommendation is published as *Priest v. DBI Servs., LLC*, No. 3:21CV712 (DJN), 2022 WL 4242836 (E.D. Va. July 21, 2022) (report and recommendation), and the Court's order adopting the Report and Recommendation is published as *Priest v. DBI Servs.*, LLC, No. 3:21CV712 (RCY), 2022 WL 4241647 (E.D. Va. Sept. 14, 2022).

state that on October 22, 2021, Defendant "announced and ordered the termination" of "more than one hundred (100) of its Virginia-based employees [who] perform highway rest stop maintenance, landscaping, and similar services within the Commonwealth of Virginia." (*E.g.*, Sworn Decl. Damages Pl. Kevin Priest ¶ 6.) To support the allegation that Defendant's "Virginia-based yards," collectively constituted a "single site of employment," Plaintiffs claim that Defendant's Virginia workforce's organizational structure does not properly comport with Subpart 6 of the Department of Labor definitions and instead that Subpart 8 more accurately guides the analysis. (Mem. Supp. Renewed Mot. 5.) Subpart 8 notes that a "single site of employment may also apply to truly unusual organizational situations where the above criteria do not reasonably apply." 20 C.F.R. § 639.9(i)(8). Relying on this Subpart, Plaintiffs argue that the unique nature of their employment and Defendant's structuring of its employees in the Virginia-based yards warrant this subpart applying, and thus all of Defendant's Virginia-based yards should be classified as a "single site of employment." (Mem. Supp. Renewed Mot. 5–7.)

The Court accepts Plaintiffs' claim that there were more than one hundred employees terminated when Defendant closed all of its Virginia-based yards, based on the statements of the named Plaintiffs. However, Plaintiffs have not sufficiently pled whether or not the loss of "more than one hundred" employees amounted to the loss of "at least 33 percent of the employees," as required to prove a "mass layoff" occurred. Plaintiffs have never alleged exactly how many employees Defendant employed in total at the "Virginia-based yards." *See* 29 U.S.C. § 2101(a)(3)(B). Failing to establish a mass layoff, then, Plaintiffs can only proceed under a "plant closing" theory of liability under the WARN Act. *See id.* § 2101(a)(2).

However, Plaintiffs cannot proceed under the "plant closing" theory of liability, either, due to their inability to demonstrate that the harm occurred at a "single site of employment." *See id.*

§§ 2101(a)(2)–(3). Plaintiffs have not adequately demonstrated or persuasively argued that all of the Defendant's Virginia-based yards can be aggregated to constitute a "single site of employment," for the purposes of the WARN Act. Plaintiffs claim the Defendant's employment structure falls into Subpart 8 of the Department of Labor regulations. However, Subpart 8 only applies "where the [other] criteria do not reasonably apply." 20 C.F.R. § 639.9(i)(8). While they argue that Subpart 6 is inapplicable, Plaintiffs ignore Subparts 3 and 4, which reasonably apply to Plaintiffs' description of their employment with the Defendant. As quoted above, Subpart 3 allows geographically separate work areas to be considered "a single site of employment if they are in reasonable geographic proximity, used for the same purpose, and share the same staff and equipment." *See id.* § 639.9(i)(3). Subpart 4 establishes the inverse: "non-contiguous sites in the same geographic area which do not share the same staff or operational purpose should not be considered a single site." *Id.* § 639.9(i)(4).

Given the descriptions that Plaintiffs have provided, the Court finds that the employment schemes described in Subparts 3 and 4 most closely resemble Defendant's Virginia-based yards. However, of the two, the Court holds that Subpart 4 applies because the Virginia-based yards do not appear to share staff and operational purpose as a matter of course, and thus the "Virginia-based yards" cannot be aggregated under a "single site of employment". While Mr. Williams states that he has seen "VDOT coordinating Virginia-based yards which were under separate contracts to do work on a single incident or project," he does not specify how frequently this occurs. (Decl. Gerald Williams ¶ 15). Further, he notes that the "Virginia-based yards would share equipment and staff" when "VDOT coordinated various Virginia-based yards under different contracts to perform joint work." (*Id.* ¶ 16). However, he does not specify which Virginia-based yards were coordinated together by VDOT, whether that coordination was a regular practice or an

9

anomaly, and how long such coordination would last.  Lastly, the fact that Mr. Williams has seen "Virginia-based yards grouped together under some contracts and then broken up and regrouped under a different contract" does not provide the Court with any sort of clarity as to the operational structure and purpose of the Virginia-based yards as a supposed collective.  (*Id.* ¶ 17).  Most importantly, Plaintiffs have not provided the locations of the Virginia-based yards nor have they provided any geographic information about the Virginia-based yards other than they are in the state of Virginia, preventing the Court from making any determination as to their geographic proximity or lack thereof.  *See Bader v. N. Line Layers, Inc.*, 503 F.3d 813, 818–19 (9th Cir. 2007) (analyzing construction project sites and holding that they could not be aggregated together under Subparts 3 and 4 because plaintiffs failed to provide facts demonstrating that the construction sites were geographically proximate to each other).  Accordingly, the Court finds that the employment system utilized by Defendants is encompassed by Subparts 3 and 4, and it is explicitly carved-out from "single-site" treatment by Subpart 4.  And further, because the criteria of Subpart 4 applies, Plaintiffs cannot take refuge in Subpart 8.

   However, even if Subpart 8 was available, absent another applicable subpart, Plaintiffs have not sufficiently demonstrated a basis for aggregating an unknown number of Virginia-based yards scattered throughout the state of Virginia into a "single site of employment."  Plaintiffs have not even identified all of the Virginia-based yards they hope to aggregate into a "single site of employment," let alone alleged enough factual details about the day-to-day operations of each of the yards or the distance between the yards to demonstrate that they constitute a "single site of employment."  *Teamsters Local Union 413 v. Driver's, Inc.*, 101 F.3d 1107, 1109 (6th Cir. 1996) (noting that "[a]lthough no bright line test exists, the plain language of the statute and regulations makes clear that geographic proximity provides the touchstone in determining what

constitutes a 'single site'"). Furthermore, the organizational structure Plaintiffs describe is not the type of "unusual organizational situation[s]" that Courts have found to constitute a "single site of employment" when applying Subpart 8. *See Carpenters Dist. Council v. Dillard Dep't Stores*, 15 F.3d 1275, 1290 (5th Cir. 1994) (holding that two separate locations were an "unusual organizational situation" under Subpart 8 and thus a "single site of employment" when employees who were housed together and performed the same functions were split off into a different building due to space considerations).

Plaintiffs cite the Fifth Circuit's opinion in *Davis* in support of their contention that Defendant's Virginia-based yards constituted a single site of employment under Subpart 8 because all of the yards had the same "operational purpose." 728 F.3d at 487. In *Davis*, the Fifth Circuit found that Defendant's annex and yard were "truly unusual organizational situations" under Subpart 8 by incorporating an analysis of other Subparts and case law pertaining to other Subparts. *Id.* However, the situation presented in *Davis* was markedly different than the situation alleged in this instance. *Davis* involved a shipbuilding company that had a fabrication facility as well as an administration annex that was located near the fabrication facility. *Id.* at 586. The Fifth Circuit described the duties of the employees in both buildings:

> The record further demonstrates that at the time of the alleged layoffs, employees housed in the annex regularly carried out business in the yard, and vice versa. In particular, a mandatory meeting was held at the annex each Monday and was attended by many employees who were housed in the yard. Some employees who were housed in the annex would regularly—even daily—visit the yard to perform management and/or production duties. Some employees maintained offices at both the annex and the yard. It is undisputed that Meisetschlaeger, as General Manager, managed both facilities' day-to-day operations. Signal employees who were shared by and carried out daily duties for both facilities included security, health and safety, quality control, custodial services, payroll, IT, and maintenance personnel.

*Id.* at 487. In reaching its conclusion that the two facilities constituted a "single site of employment," the Fifth Circuit noted that:

> [The defendant's] administrative activities make sense only in relation to the fabrication activities that they support; conversely, fabrication requires the support of administration at all times. It is not as if the administration and fabrication facilities are each stand-alone, independent operations. Rather, they constitute one joint, integrated operation to serve the same operational purpose: the production and supply of platforms, rigs, and vessels.

*Id.* at 488.

Here, the facts are markedly different. There is no allegation or evidence presented that the yards rely on each other to accomplish tasks regularly or that the work of one yard is integral to the work of another yard. *See Int'l Union, United Mine Workers v. Jim Walter Res., Inc.*, 6 F.3d 722, 726 (11th Cir. 1993) (rejecting the argument that mines that produce the same product share an "operational purpose" and thus should be considered a "single site of employment"). Mr. Williams states he was the supervisor of the named Plaintiffs at their specific, Virginia-based yard, "Richmond North." (Decl. Gerald Williams ¶¶ 2, 5). This suggests that each yard had its own supervisor and set of employees that were assigned to operate out of that individual yard. While Mr. Williams states that all of the yards "did, more or less, the same work for VDOT pursuant to the specific yard's contract," he also notes that "the operational purpose of the Virginia-based yards was to do the work delegated to DBI pursuant to its contracts with VDOT." (*Id.* ¶¶ 8, 10.) Thus, it seems that while the yards were all owned and operated by the Defendant, each yard was assigned its own contract to perform and each yard had an agent from VDOT monitoring the day to day work of the employees at the yard. While the VDOT contracts could require the use of multiple yards and Mr. Williams states that he has seen yards grouped together and broken up based on contracts, Plaintiffs do not specify how often this grouping occurred and what yards from which areas joined together to accomplish such tasks. *See Rifkin*, 78 F.3d at 1281 (rejecting a claim of "single site employment" when "[t]here is no evidence that employees and equipment are regularly shared as opposed to occasionally transferred" between the locations). Even still,

coordinated work by multiple yards on various projects is not the same as "sharing" employees between yards, as conceptualized by the regulation's example of workers who are regularly moved between warehouses. *See* 20 C.F.R. § 639.9(i)(3).

Further, even when given the opportunity to re-file, Plaintiffs have still not listed the number of Virginia-based yards that exist, the location of the Virginia-based yards, whether or not the employees primarily do their work outside of the yards or just use the yards as a home base,[5] how frequently staff and equipment are purportedly shared between yards, the specific number of each individuals employed at each yard, and the reason why Defendant chose to split the workforce into the geographic "yards." Simply put, Plaintiffs have not pleaded sufficient facts for the Court to aggregate an unknown number of "Virginia-based yards" spread over an unknown geographic proximity into a "single site of employment" for the purposes of the WARN Act. As such, Plaintiffs have failed to demonstrate that Defendant ordered a "plant closing or mass layoff" in violation of the WARN Act. *See* 29 U.S.C. §§ 2101(a)(2)–(3), 2102(a).

## IV. CONCLUSION

Because the facts Plaintiffs have alleged are insufficient to state a claim, Plaintiffs' Renewed Motion for Default Judgment (ECF No. 17) will be denied without prejudice. An appropriate Order shall issue.

/s/ *[signature]*
Roderick C. Young
United States District Judge

Richmond, Virginia
Date: March 29, 2023

---

[5] This is particularly relevant given that Subpart 6 defines the "single site of employment" for "workers whose primary duties require travel from point to point, who are outstationed, or whose primary duties involve work outside any of the employer's regular employment sites" as their "home base," or as the place that they get work assignments from or place that they report to. *See* 20 C.F.R. § 639.3(i)(6); *Meson*, 507 F.3d at 809 ("Although subpart (6) could be read literally to cover almost any employee who leaves her office, we believe it was intended to apply only to truly mobile workers without a regular, fixed place of work.").